## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| SHANNON ZOLLER and ALEXANDER BEIGELMAN, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UBS SECURITIES LLC, UBS FINANCIAL SERVICES INC., and UBS AMERICAS INC., <br><br> Defendants. | No. 1:16-cv-11277 <br><br> Jury Trial Demanded <br><br> Hon. Judge Milton I. Shadur |

## AMENDED COMPLAINT

Plaintiffs Shannon Zoller ("Zoller") and Alexander Beigelman ("Beigelman") (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, Stowell & Friedman, Ltd., hereby file this Amended Complaint against Defendants UBS Securities LLC, UBS Financial Services Inc., and UBS Americas Inc. (collectively "UBS" or the "Firm") and state as follows:

## JURISDICTION AND VENUE

1. Plaintiffs Zoller and Beigelman, on behalf of themselves and all others similarly situated, seek legal and equitable relief for violations of state or common law. This Court has original jurisdiction over the state or common law class claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), and in the alternative, supplemental jurisdiction over all state or common law claims in this action under 28 U.S.C. § 1367.

2. Plaintiff Beigelman, on behalf of himself and all others similarly situated, alleges claims under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C § 621 *et*

*seq*., and the Older Workers Benefit Protection Act, Pub. L. 101-433 ("OWBPA"). This Court

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

3.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391.

Defendants are licensed to do business and maintain a number of branch offices in this District

and service clients who are residents of this District. Plaintiff Zoller is a resident of this District

and worked for and was harmed by UBS in this District. The unlawful conduct alleged in this

Amended Complaint occurred in this District and across the United States.

## PARTIES

4.      Defendants UBS Securities LLC and UBS Financial Services Inc. are subsidiaries

of UBS Americas Inc., and all three Defendants are subsidiaries of the publicly traded Swiss

corporation UBS AG. UBS provides financial and wealth management services to its clients.

UBS AG employs approximately 60,000 people worldwide and is primarily traded on the New

York Stock Exchange with a market capitalization of $75.6 billion. In 2015, UBS AG's net

profit attributable to shareholders exceeded $6.25 billion.

5.      Plaintiff Shannon Zoller was employed by UBS as an Executive Director from

September 2008 until March 30, 2013. Zoller is a resident of and was employed by UBS in

Illinois.

6.      Plaintiff Alexander Beigelman is over forty years of age and was employed by

UBS from August 2007 until January 2015. Beigelman is a resident of New York and was

employed by UBS in New Jersey.

## FACTUAL ALLEGATIONS

7.      Plaintiffs and all others similarly situated are former UBS employees who were

terminated as "redundant" by UBS as part of purported Reductions in Force ("RIFs") and who

were unlawfully presented with a Hobson's choice: sign a release forfeiting incentive and deferred compensation for the final year of work and/or all discrimination claims against UBS, or forfeit *all* earned incentive compensation, deferred compensation, and severance pay.

I. **UBS's Bait-and-Switch Scheme To Deprive Its Employees Of Their Earned Compensation And Avoid Liability For Discrimination**

**Overview of UBS's Scheme**

8.     UBS compensates its employees pursuant to uniform, nationwide compensation policies and plans centrally issued on an annual basis. In accordance with the compensation policies and plans, UBS generally pays its management employees through salary and incentive and deferred compensation. The salary component of compensation is not intended to fully compensate UBS employees for the work they perform. Incentive and deferred compensation represent a significant portion of the total compensation promised to and earned by UBS employees, particularly those who hold higher positions, who typically are older.

9.     Indeed, to induce potential employees to accept positions and to continue working for the company, UBS promises them, in writing, substantial incentive and deferred compensation for their efforts, to complement their comparatively low salaries. UBS employees, including Plaintiffs, reasonably relied on these written promises when they signed on to work for UBS and continued working for UBS rather than joining a competitor. They also relied on UBS's longstanding practices of awarding incentive and deferred compensation to its managerial employees.

10.     In addition, when agreeing to work for UBS, employees do so with the understanding that UBS will comply with all applicable laws, including anti-discrimination laws, and wage laws governing the employment relationship. UBS does not purport to (nor could it, legally) condition the full payment of the employees' compensation on their release of all

potential legal claims.  In reality, however, UBS enters into the employment relationship with the secret intent that it will ultimately refuse to pay the employees' full wages.

11.     Unknown to its employees, UBS engaged in a scheme to deprive many employees of their promised and hard-earned compensation.  Under this scheme, UBS receives the benefit of its employees' services, represents to governmental agencies (including the IRS and SEC) and the investing public that the employees will be paid for these services by reporting accrued compensation liabilities and tax deductions, then terminates and refuses to pay these employees the full compensation they have earned.

12.     The Firm's treatment of incentive compensation under the tax laws makes clear that this compensation is determinable and earned at year-end.  Under certain conditions, the United States tax code permits employers to deduct incentive compensation earned by employees in a given year but not paid to those employees until the following year.  To illustrate, IRS Code Sec. 461 generally allows an employer to deduct in Year One incentive bonuses that it pays to employees within the first 2½ months ("grace period") of Year Two (*i.e.*, for a calendar-year employer, a deduction in 2013 for a payment by March 15, 2014), even if the employees are not taxed until Year Two.  Treas. Reg. Sec. 1.461-1(a)(2)(i) provides that a liability is accrued and is generally taken into account for federal income tax purposes in the taxable year in which (1) all the events have occurred that establish the fact of the liability, (2) the amount of the liability can be determined with reasonable accuracy, and (3) economic performance has occurred with respect to the liability, *i.e.*, the employee has worked and earned the pay.  Thus, this 2½-month grace period into the next tax year applies only if "all events" fixing the obligation have occurred by the end of Year One.

13.     Consistent with IRS Code Sec. 461, all events have occurred to fix the liability for UBS incentive compensation by December 31 of any year.  The Firm accepts the benefit of IRS Code Sec. 461 by deducting the incentive compensation expense against Year One revenue, even though employees are not paid until sometime within the 2½-month grace period in Year Two.

14.     After determining the liability for employee incentive compensation to accrue and expense for tax purposes, UBS begins a vigorous campaign during the grace period to recoup or unjustly retain the money earned by its employees.  First, UBS targets for termination in purported RIFs employees who have earned and been allocated incentive compensation by December 31 of Year One with the intent of denying these employees incentive compensation and deferred compensation for Year One.  Second, UBS threatens those targeted employees that if they do not execute a general release of all claims, including discrimination claims, they will forfeit both deferred compensation earned in prior years and severance pay.  Third, UBS confiscates the incentive compensation earned and to be paid by the end of the grace period from the newly terminated employees.  Thus, UBS retains the incentive compensation it expensed and deducted in Year One that should have been paid to the terminated employees in Year Two. Employees who seek to challenge the release requirement under the discrimination laws or OWBPA are not paid severance, deferred compensation, or the incentive compensation they earned – the bonuses UBS promised them – in the last year of their employment.  Finally, UBS through its Human Resources department falsifies or alters downward the already completed performance reviews of its employees who are identified to be eliminated as "redundant" as a cover-up of this scheme.

15.     UBS strategically times many employee RIFs to occur during the IRS grace period, after employees have performed a full year of work and economic performance has

occurred but prior to the payment of their incentive compensation, in order to avoid paying the Firm's employees the rightfully earned incentive and deferred compensation due them, while still taking a tax deduction and reporting the incentive compensation as an expense and accrued liability on its annual report and financial statements provided to the SEC, the IRS, and the investing public.

16. Moreover, UBS's scheme to deprive its employees of compensation, and to avoid liability for violations of employment law, relies on the extremely broad arbitration clauses UBS forces all its employees to sign. In essence, when UBS terminates employees, it holds hostage their deferred compensation unless they waive all claims to incentive compensation and deferred compensation earned in Year One but due to be paid in the grace period in Year Two, as well as discrimination claims against UBS.

17. UBS also prohibits employees from pursuing claims in federal courts, which are accustomed to fairly adjudicating employment discrimination and denial of benefit claims. Instead, employees are forced into employer friendly, one-sided, costly, and protracted arbitrations before the Financial Industry Regulatory Authority ("FINRA"), at which their rights are unlikely to be vindicated.[1] Moreover, UBS also purports to force its employees to forgo their rights to proceed on a class or collective action basis, whether in litigation or arbitration. Faced with this Hobson's choice, many employees – exactly as UBS intended – purport to release their compensation and discrimination claims in order to recover at least a portion of the money they are owed.

---

[1] FINRA is the largest independent regulator for all securities firms in the United States. http://www.finra.org.

18.     For those who make the choice to take the risk of FINRA arbitration, UBS is not satisfied simply to hold the advantage in an industry-sponsored arbitration.  Thus, it engages in high-handed tactics, including but not limited to:  1) refusing to produce discovery from its managers, claiming that "Swiss law" bars this production; 2) submitting overstated and false cost estimates for producing emails and seeking to shift the costs of production to its employees; 3) delaying the FINRA arbitrations because it does not produce discovery or asserts that its lawyers do not have sufficient time to engage in the arbitration due to their arbitration schedules; 4) filing frivolous counter-claims against its employees for the return of benefits it paid to employees who refused to sign the releases; and 5) otherwise engaging in scorched-earth litigation tactics so that the FINRA arbitration, which was represented as an economical, expeditious and fair process, is nothing more than a war of attrition against the few employees whose dare to refuse to sign the releases and seek instead to recover the money that was unlawfully withheld from them due to the above alleged scheme.

19.     The purpose of UBS's bait-and-switch scheme is three-fold:  (a) to ensure that employees never receive the full incentive compensation and deferred compensation which UBS promised them and to which they are entitled; (b) to shield UBS from any liability for unlawful employment practices, by conditioning payment of some of an employee's earned compensation on a release of all claims against UBS; (c) to allow UBS to gain the benefit of its employees' hard work for the full year and the benefit of the tax expense of the unpaid bonuses, while never paying the bonuses to its employees who worked the full year.

20.     Plaintiffs Zoller and Beigelman were victims of this scheme.

**UBS's Unlawful Attempt To Withhold Full Payment To Avoid Discrimination Claims**

21.     Under UBS's compensation plans, as agreed to by Plaintiffs when they joined UBS, employees terminated as "redundant" are entitled to receive their deferred compensation. This is because deferred compensation is intended to give employees an incentive not to join the competition and to permit the Firm to withhold deferred compensation from employees who have committed acts harmful to UBS. The purpose of deferred compensation is not to punish employees terminated for business restructurings and other reasons. UBS offers its potential and current employees deferred compensation to induce them to work for UBS and stay there. UBS's employees reasonably rely on UBS's promise of deferred compensation when they elect not to join the competition.

22.     However, on February 28, 2013, without additional consideration to plan participants, UBS purported to limit the definition of "redundant" to refer only to employees who were eliminated in a RIF and *also* signed a general release of all claims. Consistent with the secretive nature of UBS's scheme, this new, counter-intuitive, strategically crafted re-definition of "redundant" appeared nowhere in UBS's compensation plans, but was inserted into the appendix of a separate document entitled "Common Terms."

23.     Thus, according to UBS, an employee terminated in January, such as Beigelman, would be forced either to sign a general release, including all discrimination claims, in order to receive his deferred compensation from prior years. However, by signing the release such an employee would forfeit the incentive and deferred compensation earned for work performed in Year One. The only option for an employee who refuses to sign the release, according to UBS, is to leave all of the money on the table and gamble with FINRA arbitration while facing counterclaims by UBS. In addition, by terminating employees before payout of the prior year's

incentive compensation, UBS contends that employees forfeited their accrued incentive compensation, even though UBS had previously allocated and expensed the incentive compensation for Year One and committed to paying it during the IRS grace period. Likewise, an employee like Zoller, who was terminated purportedly in the "grace period," was denied her bonus and required to sign a release to receive her severance pay in an amount substantially less than the bonus or arbitrate all claims at FINRA.

24. Indeed, UBS never provided employees during their employment a copy of the release they would be required to sign, even though this release encompasses discrimination claims. UBS provided the release to employees only when they were terminated. Even in the unlikely event that an enterprising employee dug up the new "Common Terms" appendix and discovered the new, bizarre, definition of "redundant," he would not learn what he had to release in order to obtain his deferred compensation, unless and until UBS fired him. Thus, UBS failed to make a meaningful or effective disclosure of the terms of the newly required general release.

25. Nothing in UBS's compensation plans or the Common Terms appendix notified the Firm's employees that in order to retain their earned but deferred compensation in the event of a layoff, they would be required to sign a general release that (a) waives their rights under federal anti-discrimination laws, including the ADEA, and (b) relinquishes their claims for earned incentive and deferred compensation earned in Year One and due to be paid in the grace period. Indeed, the Common Terms did not disclose any of the terms of the release that laid off employees would be required to sign, including the consideration (if any) that would be offered in exchange for the general release. UBS's attempt to force employees to sign a general release of discrimination claims by amending an appendix to the "Common Terms" document, without disclosing the terms of the release, violates the ADEA and OWBPA.

26.     In any event, according to the express terms of the plans at issue, the "Common Terms" do not form a part of the plan rules if those rules differ from the "Common Terms."  In the event of any conflict between the "Common Terms" and the compensation plans, the terms of the plans themselves will prevail.  Because the compensation plan rules do not contain the Common Terms' new, counterintuitive definition of "redundant," the plan rules prevail.  UBS violated the terms of its own compensation plans by insisting that employees, such as Beigelman, sign the general release to receive vested deferred compensation earned in prior years and in Year One, while forfeiting the previous year's earned, allocated and expensed incentive compensation.

27.     Further, UBS's attempt to amend the definition of the "Common Terms" was ineffectual for yet another reason:  it was improperly retroactive.  Plaintiffs and all similarly situated employees worked for the entire year of 2012, with the reasonable expectation of being compensated based on the plan then in existence.  Only after Plaintiffs had worked the entire year based on that expectation – under the terms of a plan that incorporated "Common Terms" with a reasonable definition of "redundant" – did UBS purport to alter the bargain on February 28, 2013.  It was too late, however, effectively to reduce Plaintiffs' compensation by forcing them to give up any claims against UBS in order to receive their already-earned deferred compensation.

28.     UBS lags behind the country in terms of its hiring and employment of diverse employees.  Rather than comply with the civil rights laws and integrate its workforce, UBS blocks discrimination lawsuits by imposing mandatory arbitration agreements and class action waivers on its employees.  UBS's February 28, 2013 attempt to limit the definition of "redundant" to refer only to those who sign releases, including of discrimination claims, is yet

another way that UBS attempts to block discrimination lawsuits and maintain its predominately younger, white male workforce.

29.     In addition to adding a definition that purported to re-define the term "redundant," UBS also sought in the Common Terms to bar U.S. employees from challenging any of the Firm's employment policies or practices on a class, collective, or representative action basis, including the Firm's failure to make meaningful or effective disclosure of the waiver of ADEA claims or class action rights.  The Firm's attempt to evade judicial scrutiny of its discrimination against older workers in violation of the ADEA and OWBPA by prohibiting collective action is itself unlawful.

30.     UBS in bad faith terminated Plaintiffs and others similarly situated at a time when UBS could fully capitalize on the benefits that employees like Plaintiffs had conferred on the Firm without paying them the incentive compensation they earned.

31.     UBS breached its promises to Plaintiffs and all others similarly situated and was unjustly enriched to the detriment of these employees, as the Firm retained the substantial monies lawfully earned by its employees for the Firm's own gain.

32.     UBS's scheme to force workers to forfeit their legal rights and their earned incentive and deferred compensation disproportionately affects older workers, and prevents them from receiving the incentive and deferred compensation they earned and from prosecuting class action claims when their positions are eliminated.

33.     Plaintiffs and all others similarly situated challenge UBS's ongoing nationwide pattern and practice of discrimination against its employees, including older workers, under both differential treatment and disparate impact theories of liability.  Older workers are disproportionately and intentionally impacted by these practices.

## II.    Plaintiffs And All Others Similarly Situated Were Subjected To And Harmed By UBS's Unlawful Conduct

**Shannon Zoller**

34.    Plaintiff Shannon Zoller was employed by UBS as an Executive Director from September 17, 2008 until March 30, 2013.

35.    UBS induced Zoller to begin her employment at UBS, and to keep working there, by promising her full incentive compensation.

36.    When she was hired, and at all times during her employment, Zoller reasonably believed that UBS would pay her, as promised, her full incentive compensation.

37.    In February 2013, UBS notified Zoller that she was to be terminated as "redundant" as part of a purported UBS RIF.

38.    UBS provided Zoller with an Employee Reference Sheet setting forth her severance benefits.  UBS informed Zoller that she would be terminated effective March 30, 2013.

39.    Because Zoller was terminated as "redundant," she was entitled to retain her deferred compensation without risk of forfeiture or being required to execute a general release of all claims.  In addition, although Zoller met the Firm's requirement of being employed on March 15, 2013, the latest date on which her incentive compensation could be paid, UBS refused to pay her 2012 incentive compensation.

40.    UBS breached the terms of its compensation plans by denying Zoller her 2012 incentive compensation, which unjustly enriched UBS to the detriment of Zoller.

**Alexander Beigelman**

41.    UBS recruited and hired Beigelman in August 2007 to serve as Head of Technical Architecture and Engineering, UBS Wealth Management Americas.  Shortly after joining UBS,

due to his strong performance and experience, Beigelman was offered and accepted an additional role as Head of Information Security for UBS Wealth Management Americas, and eventually became Head of Information Security for UBS Americas.  In 2014, Beigelman was promoted to Managing Director, a position he held until January 13, 2015, when UBS notified Beigelman he was to be terminated as "redundant" as part of a purported UBS RIF.

42.     UBS induced Beigelman to begin his employment at UBS, and to keep working there, by promising him full incentive and deferred compensation.

43.     When he was hired, and at all times during his employment, Beigelman reasonably believed that UBS would pay him, as promised, his full deferred compensation and incentive compensation.

44.     Having decided to terminate Beigelman in January 2015, UBS then refused to pay his 2014 incentive compensation, claiming that the Firm's compensation plan required him to be employed on the day on which his incentive compensation was to be paid.

45.     UBS informed Beigelman that, although he was terminated as "redundant," he would forfeit his deferred compensation from prior years and his severance pay if he did not execute a general release of claims, including claims for discrimination and for his 2014 earned, allocated incentive and deferred compensation.  Thus, in order to receive any severance or other pay after unexpectedly losing his job, Beigelman had to waive his rights to assert any and all claims against UBS.

46.     When Beigelman refused to sign the release and waiver and instead filed a Charge of Discrimination with the EEOC, UBS retaliated against him.

47.     On April 15, 2015, UBS paid Beigelman $10,825 in earned and vested deferred compensation.  At the time, UBS knew that Beigelman had refused to sign the release on the

ground it was unlawful, but UBS had nonetheless assured Beigelman payment of this vested amount.

48.     On April 28, 2015, Beigelman filed a Statement of Claim with FINRA to prosecute his state law individual claims against UBS.[2]  He did not assert any claims under the ADEA and related anti-discrimination and retaliation statutes.

49.     On May 6, 2015, Beigelman filed a Charge of Discrimination against UBS with the EEOC, asserting age discrimination.  On June 1, 2015, the EEOC notified UBS of Beigelman's Charge.

50.     At no time prior to the filing of his Charge of Discrimination did UBS request that Beigelman return the payment that UBS had voluntarily made on April 15, 2015.

51.     However, after Beigelman filed his Charge, UBS filed a counterclaim against Beigelman in his FINRA arbitration, asserting for the first time that it had paid Beigelman in error and that Beigelman should be required to repay the $10,825 UBS had voluntarily and lawfully paid him.

52.     UBS's actions towards Beigelman and all others similarly situated have a chilling effect and send a clear message to the Firm's employees that those who come forward and complain of discriminatory conduct or practices will suffer retaliation.

53.     On August 6, 2015, Beigelman filed a Charge of Discrimination, alleging that UBS unlawfully retaliated against him, as described above.

---

[2] FINRA Rule 13204 bars arbitration of class action claims or collective action claims. Beigelman's individual and collective action claims arising under the ADEA are not the subject of his FINRA arbitration.

54.    The EEOC issued Rights to Sue on Beigelman's Charges of Discrimination filed on May 6, 2015 and August 6, 2015.

### III.    Summary Of Allegations

55.    UBS promised to pay Plaintiffs and all other similarly situated employees the full amounts of their incentive and deferred compensation.  These promises were intended to induce Plaintiffs and all similarly situated employees to rely on them, by beginning and continuing employment with UBS, rather than joining a competitor.

56.    At the time it made such promises, UBS did not intend to perform.  Rather, UBS devised the scheme described above to avoid paying its employees what it promised.  To obtain tax benefits, UBS intended to represent to the IRS that it would pay employees the full compensation they were promised.  Then, after terminating Plaintiffs and similarly situated employees, UBS would refuse to pay them their full incentive and deferred compensation.

57.    Plaintiffs and all similarly situated employees reasonably relied on UBS's promise to pay them their full incentive and deferred compensation.

58.    Plaintiffs and all similarly situated employees were damaged by UBS's failure to pay them their full incentive and deferred compensation.

59.    UBS entered into certain written contracts with Plaintiffs and all other similarly situated employees, whose terms are set forth in written instruments.  These contracts governed UBS and created obligations to Plaintiffs and all other similarly situated employees with respect to their terms of employment, including that UBS would act in compliance with state and federal law.  These contracts pertained to UBS's compensation plans, including incentive and deferred compensation.

60.     These contracts required UBS to comply with their terms and with federal and state laws.

61.     Plaintiffs and all other similarly situated employees fully performed the terms of their contracts with UBS.

62.     UBS breached these contracts by engaging in the conduct described herein and by otherwise failing to perform its obligations under these contracts and the law, as set forth in this Amended Complaint.

63.     By engaging in the conduct described above, UBS breached these contracts, causing Plaintiffs and all other similarly situated employees substantial harm.

64.     UBS had a fiduciary duty not to cause unreasonable harm to Zoller and Beigelman and all others similarly situated or to abuse their trust. UBS failed to comply with their representations, agreements and contracts with Plaintiffs and all others similarly situated. By engaging in the conduct described above and otherwise failing to perform their agreed-upon obligations, UBS breached its fiduciary duty to Plaintiffs and all others similarly situated and caused Beigelman and Zoller and all others similarly situated substantial harm.

65.     Throughout their tenure at UBS, Plaintiffs and all others similarly situated performed services in good faith.

66.     Through their performance, Plaintiffs and all others similarly situated directly contributed their services to UBS's revenue generation. This resulted in greatly increased profits for UBS, and those increased profits will continue well into 2017 and beyond.

67.     UBS accepted the services of Plaintiffs and all others similarly situated and derived great benefit from these services.

68.     Plaintiffs and all others similarly situated reasonably expected full compensation for their services to UBS, but UBS failed to pay them incentive and deferred compensation they had earned as a result of their contributions to the Firm.

69.     Plaintiffs and all others similarly situated reasonably expected to receive all earned incentive and deferred compensation.

70.     By engaging in the conduct described above and otherwise failing to perform their agreed-upon obligations, UBS was unjustly enriched by the services provided by Plaintiffs and all others similarly situated, but for which they were not compensated.

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

71.     This is a class and collective action in which:  (1) there are 100 or more putative class members; (2) at least some members of the proposed classes have different citizenship from Defendants; and (3) the claims of the proposed class members exceed $5,000,000.00 in the aggregate, exclusive of interest and costs.

72.     Plaintiffs Zoller and Beigelman bring their claims on behalf of themselves and all others similarly situated.

73.     Plaintiff Zoller brings her claims on behalf of herself and all others similarly situated and formerly employed by UBS in Illinois.

74.     Plaintiff Beigelman brings a collective action pursuant to 29 U.S.C. §§216(b) and 626(b), seeking monetary damages and other make-whole, declaratory, and injunctive relief on behalf of a collective of all UBS employees 40 years or older who were subjected to RIFs, denied their incentive or deferred compensation and/or severance pay, and required to sign a general release of all discrimination claims in order to retain a portion of their earned incentive and deferred compensation.

75.     There are numerous similarly situated former UBS employees who have suffered from Defendants' practices and who would benefit from the issuance of court-supervised notice of this lawsuit and the opportunity to join. Those similarly situated employees are known to Defendants and are readily identifiable through Defendants' records.

76.     Plaintiffs have retained counsel competent and experienced in complex employment litigation, including class and collective actions.

77.     Plaintiffs seek class certification of their claims under state law on behalf of all UBS employees who were terminated as redundant, denied payment of earned incentive, deferred compensation, or severance pay, and required to sign a general release in order to retain a portion of their earned incentive and deferred compensation.

78.     This proposed class of employees meets all requirements of Rule 23(a) as the employees are so numerous that joinder is impracticable, the class presents common questions of law and fact, Plaintiffs' claims are typical of those of the class, and Plaintiffs will fairly and adequately protect the interests of the proposed class.

79.     This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. The class members are entitled to injunctive relief to end Defendants' common, uniform, unlawful, and discriminatory policies and practices.

80.     This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because questions of law or fact predominate over any questions affecting individual class members, and a class action is superior to other methods in order to ensure a fair and efficient adjudication of this controversy. Among other reasons, class litigation is superior

because it will preclude the need for unduly duplicative litigation potentially resulting in inconsistent judgments pertaining to Defendants' policies and practices. In addition, this action presents no difficulties in management as a class action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court find against Defendants and:

a. Certify this case as a collective and class action;

b. Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

c. Declare that the acts and conduct of Defendants are unlawful and violate federal and state law;

d. Declare that Defendants engage in a pattern or practice of age discrimination against older workers and employ policies and practices that have an unlawful disparate impact on older workers;

e. Enjoin Defendants from implementing class action waivers;

f. Order that Defendants rescind all releases obtained from former UBS employees terminated as redundant or as part of a purported Reduction in Force;

g. Order Defendants to pay their redundant employees full severance benefits and deferred and incentive compensation, plus interest;

h. Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

i. Award Plaintiffs and all others similarly situated liquidated damages for compensation and benefits lost as a result of Defendants' willful, unlawful conduct;

j.      Award Plaintiffs and all others similarly situated attorneys' fees and costs;

k.      Award Plaintiffs and all others similarly situated punitive damages due to Defendants' malice and/or reckless indifference to the federally protected rights of Plaintiffs and all others similarly situated;

l.      Award Plaintiffs and all others similarly situated prejudgment interest, as provided by law; and

m.      Award Plaintiffs and all others similarly situated any other equitable, injunctive and legal relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs and all others similarly situated hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Respectfully submitted,

STOWELL & FRIEDMAN, LTD.

By:___*/s/ Linda D. Friedman*_____
        Linda D. Friedman

**STOWELL & FRIEDMAN LTD.**
303 W. Madison
Suite 2600
Chicago, Illinois 60606
Phone: (312) 431-0888
Lfriedman@sfltd.com

## CERTIFICATE OF SERVICE

I, Linda D. Friedman, an attorney, hereby certify that on April 14, 2017, I filed the foregoing *AMENDED COMPLAINT* via the Court's CM/ECF system, which caused a copy of the same to be served upon all counsel of record via ECF.

*/s/  Linda D. Friedman*