# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SHANNON ZOLLER and ALEXANDER BEIGELMAN, on behalf of themselves and all others similarly situated, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>UBS SECURITIES LLC, UBS FINANCIAL SERVICES INC., and UBS AMERICAS INC., )<br><br>Defendants. ) | Case No. 16 C 11277 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

UBS terminated two of its employees as part of what it contends was a reduction in force. The former employees contend their termination was part of a more sinister program: by terminating its employees before it had to pay out bonuses, UBS was able to reap the benefits of their labor without having to provide the substantial compensation that it was otherwise obligated to pay. UBS argues that, no matter the merits of the dispute, the plaintiffs agreed to arbitrate disputes with the company. UBS has moved to compel arbitration for one plaintiff and to dismiss the claim of the other plaintiff, who has already begun to arbitrate a separate set of claims concerning his termination.

## Background

Shannon Zoller and Alexander Beigelman are both former employees of UBS Securities LLC, UBS Financial Services Inc., and/or UBS Americas Inc. (collectively, UBS). Zoller, an "executive director" who was terminated in March 2013, and

Beigelman, a "managing director" who was terminated in January 2015, allege that UBS defrauds its employees through a scheme in which it promises employees yearly bonuses but fires many employees before the bonus accrues.  To add insult to injury, plaintiffs allege, UBS will pay a terminated employee some withheld compensation—but only if the employee releases UBS from all employment-related claims.  Zoller and Beigelman allege that this scheme allows UBS to (1) benefit from its employees' labor without fully paying for it, (2) accrue tax benefits, as it writes off bonuses that it never actually pays, and (3) insulate itself from subsequent litigation through its coercive use of severance agreements that require ex-employees to release UBS from any claims. Compl. ¶ 19.  Beigelman, who is older than 40, also alleges that his discharge violated federal statutes forbidding age discrimination.  Zoller and Beigelman want to represent a class of similarly-situated employees who were discharged through UBS's purported scheme.

Before filing the present lawsuit, Beigelman had already begun to arbitrate state-law claims against UBS in New York before the Financial Industry Regulatory Authority (FINRA).  The claims Beigelman has asserted in the FINRA arbitration involve the wrongful denial of his bonus, deferred incentive compensation, and severance.  UBS argues that Beigelman's initial instinct to pursue arbitration was correct, because he is contractually bound to arbitrate his claim.  UBS has moved to compel Zoller to arbitrate her claim before FINRA in Chicago and has moved to dismiss Beigelman's claim for improper venue on the ground that he has already begun arbitration.[1]  (Though the

---

[1] *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 808 (7th Cir. 2011) ("[A] Rule 12(b)(3) motion to dismiss for improper venue, rather than a motion to stay or to

arbitration agreements may permit arbitration before FINRA or another arbitral forum, JAMS, UBS does not ask the Court to compel the plaintiffs to arbitrate at JAMS and does not discuss that aspect of the agreements, so the Court need not deal with that point.)

## Discussion

The Federal Arbitration Act (FAA) instructs that arbitration clauses "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Arbitration is a contractual matter between parties, *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010), and if one of the parties tries to litigate a claim that their contract requires to be arbitrated, the FAA permits the aggrieved party to seek "an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

UBS contends that Zoller and Beigelman contracted to arbitrate this dispute through three documents: Zoller's offer letter, Defs.' Ex. 3; Zoller's 2012 compensation agreement, Defs.' Ex. 1; and Beigelman's offer letter, Defs.' Ex. 4. Zoller suggests that her offer letter does not bind her to arbitration, because it requires that UBS follow whatever "arbitration procedures [are] in effect at the time of the filing of a claim." Defs.' Ex. 3 at 5 (Zoller offer letter). She argues that this clause is so broad that it does not actually bind UBS to any particular arbitration terms. Resp. Br. at 14. Although the Seventh Circuit has held that broad arbitration provisions similar to the one in Zoller's offer letter are unenforceable, *see Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753, 760 (7th Cir. 2001), Zoller cannot escape arbitration quite that easily, as she also

---

compel arbitration, is the proper procedure to use when the arbitration clause requires arbitration outside the confines of the district court's district.") (citation omitted).

3

agreed to arbitration when accepting a compensation package during her employment with UBS.  *See* Defs.' Ex. 1 (Zoller 2011/12 Equity Ownership Plan Agreement).

The Court concludes that both Zoller and Beigelman are contractually bound to arbitrate—Beigelman by his offer letter and Zoller by her compensation agreement. Moreover, neither Zoller nor Beigelman contend that their claims are outside the scope of the agreement.  The Court thus concludes that the claims Zoller and Beigelman present in this case are within the scope of the relevant arbitration clauses.  From here on, because these agreements are so similar, the Court will refer to them in the singular for ease of reference.

Beigelman and Zoller argue that, for four reasons, their arbitration agreement is unenforceable.  First, they argue that the arbitration agreement does not apply to putative class and collective action claims.  Second, they contend that FINRA arbitration is prohibitively expensive.  Third, the plaintiffs argue that the arbitration agreement is unenforceable because it is part of UBS's larger fraudulent scheme to deprive employees of earned bonuses.  Fourth, they assert that UBS has waived arbitration, as it presented arguments on the merits of their claims.

I. **Class and collective action claims**

The plaintiffs argue that the Court should not compel arbitration of their claims because FINRA precludes arbitration of class or collective actions before FINRA arbitrators.  FINRA Rule 13204 states that "[a] member . . . may not enforce any arbitration agreement against a member of a certified or putative class action with respect to any claim that is the subject of the certified or putative class action," until one of four conditions are met, such as the decertification of the class.  *Id.* at (a)(4).  UBS

4

cannot show any of those conditions are met. A similar rule governs collective actions. *Id.* at (b)(4).

UBS argues that, for two reasons, FINRA Rule 13204 does not help plaintiffs. First, UBS contends that, for a provision to "override" the FAA policy favoring arbitration, the provision must be a "contrary congressional command," and FINRA Rule 13204 is not such a command. Reply Br. at 6. Second, UBS argues that Beigelman and Zoller both waived the right to bring a class or collective action claim. *Id.* at 7.

### A. "Contrary congressional command"

UBS argues that FINRA Rule 13204 cannot prevent arbitration of the plaintiffs' class claim. Specifically, UBS contends that the rule bars arbitration only if enforcement of the arbitration clause would be "contrary" to FINRA Rule 13204 and if the rule is a "congressional command." Reply Br. at 6. UBS argues that *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013), requires plaintiffs to meet these requirements, because the Supreme Court held in that case that a federal statutory claim could be arbitrated "unless the FAA's mandate has been overridden by a contrary congressional command." *Id.* at 233 (internal quotation marks and citation omitted).

The Second Circuit has arguably applied the "contrary congressional command" standard to FINRA rules. *Cohen v. UBS Fin. Servs., Inc.*, 799 F.3d 174 (2d Cir. 2015). In *Cohen*, the Second Circuit dealt with a case with facts very similar to this one: a UBS employee tried to bring a class action against UBS for purportedly unlawful treatment of its employees; UBS argued that the plaintiff had bound himself to arbitrate the claim; and the plaintiff contended that FINRA Rule 13204 kept his claim out of arbitration. *Id.* at 175-76. The Second Circuit appeared to apply the standard that UBS asks this Court

5

to adopt: "[the plaintiff] must therefore establish both that enforcement of the arbitration clause . . . would be 'contrary' to Rule 13204, and that Rule 13204 qualifies as a 'congressional' command." *Id.* at 178 (citing *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012)).

There are, however, reasons to doubt that the "contrary congressional command" standard announced in *CompuCredit* and *Italian Colors* applies to this case. First, the plaintiffs do not rest their argument against arbitration upon a federal statute that gives rise to their claims. *CompuCredit* dealt with plaintiffs who resisted arbitration of their Credit Repair Organizations Act (CROA) claims by arguing Congress did not intend CROA claims to be arbitrable. 565 U.S. at 97. Specifically, the plaintiffs argued that the disclosure and civil liability provisions of the CROA showed Congress intended that CROA claims remain outside of arbitration. *Id.* at 100. The Supreme Court held that these provisions in the CROA were insufficient to establish the sort of "contrary congressional command" needed to override the FAA, as neither expressly created a right to "judicial enforcement" of their federal statutory claims. *Id.* at 98-102. *See also Italian Colors*, 570 U.S. at 233-34 (finding that federal antitrust statutes did not contain a "contrary congressional command" "overriding" the FAA).

Unlike the plaintiffs in these cases, Zoller and Beigelman do not sue to enforce a federal statutory right that they contend is exempted from arbitration by the underlying statute. The plaintiff in *CompuCredit*, who sued under the CROA, and the plaintiff in *Italian Colors*, who sued under federal antitrust laws, argued that these statutes excluded their suits from arbitration. Zoller does not sue under a federal statute, and Beigelman does not contend that the ADEA "overrides" the FAA. Thus the question

6

presented in both *CompuCredit* and *Italian Colors*—whether the federal statute that created the claim the plaintiff asserts included a "contrary congressional command" that "overrides" the FAA's preference for arbitration—is absent in the present case.

The threshold problem with UBS's argument, however, is that the parties' agreement incorporates FINRA's rules, which include the prohibition on arbitration of class and collective actions. In other words, FINRA Rule 13204 is effectively part of the parties' arbitration agreement. *See Lloyd v. J.P. Morgan Chase & Co.*, 791 F.3d 265, 270 (2d Cir. 2015) ("[I]f an arbitration clause is best construed to express the parties' intent *not* to arbitrate certain disputes, that intent controls and cannot be overridden by the presumption of arbitrability.") (citation omitted); *Alakozai v. Chase Inv. Servs. Corp.*, 557 F. App'x 658, 658 (9th Cir. 2014) (holding that the arbitration agreement incorporated FINRA rules, thereby excluding class claims from arbitration). Both UBS and the plaintiffs agreed to arbitrate their claims under FINRA rules. *See* Defs.' Ex. 2 at 5 (UBS employee compensation plan rules) ("any arbitration of a Covered Claim will be conducted under the auspices and rules of the Financial Industry Regulatory Authority"). FINRA Rules include Rule 13204. Thus "to enforce agreements to arbitrate according to their terms," *CompuCredit*, 565 U.S. at 98, the Court must give effect to FINRA Rule 13204 as a term of the parties' agreement. The Court therefore overrules UBS's contention that FINRA Rule 13204 must be a "contrary congressional command" in order to apply.

    **B.**    **Class and collection action waivers**

UBS argues that FINRA Rule 13204 cannot aid plaintiffs in their effort to avoid arbitration, because they waived their right to participate in a class or collective action.

7

Plaintiffs contend that these waivers are unenforceable. UBS responds that even if the waivers are unenforceable, Zoller and Beigelman are, for reasons unique to each plaintiff, unable to assert class or collective claims. The Court next reviews each of these arguments.

### 1. Enforceability of the class and collective action waivers

UBS argues that the plaintiffs cannot bring class or collective claims, as they waived their right to assert such claims in earlier agreements. For instance, the UBS compensation plan states "the Employee and the Corporation agree that no Covered Claims may be initiated . . . on a class action basis, collective action basis, or representative action basis . . . ." Defs.' Ex. 2 at 12 (UBS employee compensation plan rules). UBS contends that FINRA Rule 13204 "does not preserve the right to assert a claim in class or collective form notwithstanding a contractual waiver." Reply Br. at 7 (citing *Cohen*, 799 F.3d at 178).

Zoller and Beigelman argue that, under *Lewis v. Epic Systems Corp.*, 823 F.3d 1147 (7th Cir. 2016), *cert. granted*, 137 S. Ct. 1809 (2017), the waivers are unenforceable. In *Lewis*, the Seventh Circuit considered the relationship between the FAA and the National Labor Relations Act (NLRA). *Id.* at 1151. The NLRA states that "[e]mployees shall have the right to . . . engage in other concerted activities for the purpose of . . . mutual aid or protection," including litigation. 29 U.S.C. § 157. Because collective and class actions "allow employees to band together and thereby equalize bargaining power," the Seventh Circuit reasoned, "[c]ontracts that stipulate away employees' [NLRA] rights . . . are unenforceable." *Lewis*, 823 F.3d at 1153, 1155. The Seventh Circuit concluded in *Lewis* that a waiver of the employees' right to participate in

8

class or collective actions was unenforceable. *Id.* at 1154-55.

The class and collective action waivers that UBS presents are among the types of agreement that *Lewis* declares to be unlawful. Just as the Epic Systems waiver purported to eliminate its employees' NLRA-protected right to engage in litigation as a class, *id.*, the UBS waiver is similarly inconsistent with the NLRA and thus unenforceable under *Lewis*.

### 2. Whether Beigelman is covered by *Lewis* and the NLRA

UBS contends Beigelman may not avail himself of *Lewis* or the protections of the NLRA because he is a "supervisor" as the NLRA defines that term, not an "employee" protected by the NLRA. Reply Br. at 8. To qualify as a "supervisor" under the NLRA, a party must have "authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees . . . if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152. The burden of persuasion lies with the party claiming that the employee is a supervisor. *NLRB v. Ky. River Comm. Care, Inc.*, 532 U.S. 706, 710-11 (2001).

To establish that Beigelman is a supervisor, UBS has presented a snippet of the claim Beigelman filed in arbitration. Reply Br. at 8. The relevant excerpt states:

> [Beigelman's supervisor] sent Beigelman an email laying out the bonus pool rules for fiscal year 2014 bonus period so that Beigelman could apply them to his direct reports. . . . Over the next few days, Beigelman allocated bonuses to his direct reports pursuant to the guidelines and process he had followed every year in completing this task.

*Beigelman v. UBS Fin. Servs., Inc.*, 15-00953, at 6 (NY) (FINRA claim). This excerpt is insufficient to show that Beigelman had the authority to "reward" other employees

9

through the "use of independent judgment."  29 U.S.C. § 152.  *See also In re Oakwood Healthcare, Inc.*, 348 N.L.R.B. 686, 692-93 (2006) ("[T]o exercise 'independent judgment,' an individual must at minimum act, or effectively recommend action, *free of the control of others* and form an opinion or evaluation by discerning and comparing data.") (emphasis added).  The passage from Beigelman's arbitration claim shows that he allocated bonuses under the control of more senior employees at UBS.  *See also* Pls.' Ex. D at 22 (UBS Compensation Report 2016) ("the Compensation Committee . . . determines compensation-related matters in line with the principles set forth in the Articles of Association").  The meager evidence offered by UBS is insufficient to show that Beigelman used the sort of independent judgment required to establish that he is a supervisor within the meaning of the NLRA.  Thus Beigelman is not outside the class of workers covered by *Lewis*, and the Court need not address plaintiffs' argument regarding *Local No. 207, International Association of Bridge, Structural and Ornamental Iron Workers Union v. Perko*, 373 U.S. 701, 707 (1963) (individuals designated as supervisors may still take advantage of NLRA protections under certain circumstances).

### 3. Whether Zoller released her claims

UBS argues that, even if *Lewis* invalidates Zoller's waiver, she still cannot serve as a representative of a class or collective claim against UBS.  Specifically, UBS contends that Zoller's decision to release UBS from any claims constitutes a "substantial issue" that precludes her from serving as class representative.  Reply Br. at 9.

As plaintiffs point out, an argument that Zoller's claims are barred by the release she signed would amount to an argument asking the Court to rule on the merits of

10

Zoller's claim, which would be inconsistent with and likely a waiver of UBS's claimed right to insist on arbitration of her claim. *Id.* But the Court does not read UBS's argument that way; it limits the argument to one regarding the appropriateness of Zoller as a class or collective representative. That, however, is an issue for another day; plaintiffs have not yet asked the Court to certify the case as a class or collective action.

In sum, the Court concludes that FINRA Rule 13204 precludes arbitration of plaintiffs' putative class and collective claims, that the class and collective action waivers that UBS asserts are invalid under *Lewis*, and that Beigelman and Zoller are not at this stage, precluded from asserting class or collective claims.

### C. The effect of Beigelman's pending FINRA arbitration

UBS argues that Beigelman cannot proceed with this lawsuit because of his pending parallel FINRA arbitration claim against UBS. UBS cites three cases that, it argues, all stand for the principle that a party cannot sue in a federal forum after bringing related claims in arbitration. *Id.* None of the cases, however, actually stand for that proposition. In *Jones Dairy Farm v. Local No. P-1236, United Food and Commercial Workers International Union, AFL-CIO*, 760 F.2d 173 (7th Cir. 1985), the Seventh Circuit held that a party that submits an issue to arbitration cannot subsequently argue that the arbitrator lacked authority to resolve the issue. *Id.* at 175. But Beigelman is not challenging FINRA's authority to arbitrate the claims already before the arbitrator; he is challenging UBS's authority to insist that he arbitrate a separate claim. Resp. Br. at 14-15. For this same reason, UBS's reliance upon *Grumhaus v. Comerica Securities, Inc.*, 223 F.3d 648, 650 (7th Cir. 2000), and *Southwestern Electric Cooperative, Inc. v. International Brotherhood of Electrical*

11

*Workers, Local No. 702*, No. 11-cv-1047-DRH, 2012 WL 3705181, at *6 (S.D. Ill. Aug. 27, 2012), is also unconvincing.

UBS also argues that FINRA Rule 13209 bars Beigelman from bringing another suit that concerns the matters raised in the arbitration. FINRA Rule 13209 states that "no party may bring any suit . . . against any other party that concerns or that would resolve any of the matters raised in the arbitration." The purpose of this rule, it appears, is to require a party involved in FINRA arbitration to bring all of his claims in the arbitration rather than engaging in piecemeal litigation. But FINRA Rule 13204, discussed earlier, *precludes* FINRA arbitration of the class and collective claims that Beigelman has brought in the present suit. Thus Beigelman cannot assert his present claims—at least so long as they are brought on behalf of a putative class or collective group—in the pending arbitration. Under the circumstances, Rule 13209 does not bar the present suit. Indeed, another FINRA rule, Rule 13803, contemplates this exact situation and permits the respondent to consolidate claims before the court where a statutory discrimination claim like the one Beigelman has brought is pending. The rule states:

> If a current or former associated person files a statutory discrimination claim in court against a member or its associated persons, and asserts related claims in arbitration at FINRA against some or all of the same parties, a respondent who is named in both proceedings may, upon motion, compel the claimant to bring the related arbitration claims in the same court proceeding in which the statutory discrimination claim is pending, to the full extent to which the court will accept jurisdiction over the related claims.

FINRA Rule 13803(a)(1)(A). Thus UBS is free to seek consolidation of all of Beigelman's claims before this Court if it wishes to do so.

UBS also argues that Beigelman is not entitled to bring his claim in court simply

12

because it is an ADEA claim. If Beigelman were actually making this argument, the Court would agree with UBS's position. But Beigelman's argument is that arbitration is inappropriate because he is a member of a putative class, not because he is asserting an ADEA claim. Thus the Court need not address the point.

### D. Conclusion

For these reasons, the Court denies UBS's motion to compel arbitration of Zoller's claims and to dismiss Beigelman's claims. The Court will nonetheless address the parties' remaining arguments to ensure a complete record.

## II. Prohibitive expense

Next, Zoller and Beigelman argue that the arbitration agreement should not be enforced because FINRA arbitration is far too costly. An arbitration clause may invalidated if a party can show it is likely that the arbitration process would be "prohibitively expensive." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000). It is unclear whether *Green Tree* applies to Zoller's state law claims, as the Seventh Circuit has suggested that *Green Tree* may apply only to federal statutory claims. *James v. McDonald's Corp.*, 417 F.3d 672, 679 (7th Cir. 2005). The Court will assume for purposes of discussion that *Green Tree* applies to all of the plaintiffs' claims, because the plaintiffs have failed to show arbitration would be prohibitively expensive.

To evaluate whether arbitration is prohibitively expensive, the Court considers the plaintiffs' "ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether the cost differential is so substantial as to deter the bringing of claims." *James*, 417 F.3d at 680 (quoting *Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 556 (4th Cir. 2001)).

13

Beigelman, who has already started to arbitrate related claims against UBS, points to his experience in arbitration so far as evidence of the unduly high expense of FINRA arbitration. Beigelman calculates that FINRA arbitration will cost him more than $118,000 in fees and arbitrator-assigned discovery costs, exclusive of his attorney's fees. Resp. Br. at 10. Yet, Beigelman's own brief shows FINRA arbitration is not "*prohibitively* expensive." As his brief states, "Beigelman anticipates spending more than $118,000 . . . to bring the FINRA arbitration to *completion.*" *Id.* (emphasis added). In short, he effectively concedes the cost of the arbitration is not so high to prohibit him from pursuing his claim to conclusion.

Plaintiffs cite a number of cases in which arbitration agreements were invalidated as prohibitively costly, even for sums well below the $118,000 they have estimated. The distinction between those cases and the present one is that the plaintiffs who successfully invalidated their arbitration agreements demonstrated that the costs would deter them from asserting their claims. For instance, in *Plattner v. Edge Solutions, Inc.*, No. 03-CV-2646, 2004 WL 1575557 (N.D. Ill. Apr. 1, 2004), the plaintiff invalidated an arbitration agreement that imposed costs between $1,300 and $2,500 on the plaintiff. *Id.* at *1. Yet the plaintiff's overall claim was worth less than $5,000 and the plaintiff was in "severe financial [straits]," so these costs would have proven prohibitive. *Id.* By contrast, neither Zoller nor Beigelman have presented any evidence regarding their relative financial wherewithal. On the present record, they are more analogous to the plaintiff in *Gagliano v. Cytrade Financial, LLC*, No. 09-4185, 2009 WL 3366975 (N.D. Ill. Oct. 16, 2009), whose arbitration agreement was upheld after the court concluded that the plaintiff did not "show she could shoulder the cost of . . . litigation in federal court

but not the cost of arbitration." *Id.* at *6.

Because neither plaintiff has shown that the costs are so severe "as to deter the bringing of claims," *James*, 417 F.3d at 680, they have not carried their burden on this issue.

## III. Fraudulent scheme

Zoller and Beigelman argue that UBS engaged in fraud by promising bonuses to certain employees that UBS never intended to pay. They contend that the arbitration clause is unenforceable, because UBS uses the clause to "insulate" its purportedly fraudulent conduct from judicial scrutiny. Resp. Br. at 11. Plaintiffs also suggest that an arbitration clause that is "used to effect [a] fraudulent scheme" must be reviewed by a court, rather than the arbitrator. *Id.* UBS argues that plaintiffs have misstated the standard for invalidating a clause for fraud.

In *Prima Paint Corp. v. Flood and Conklin Manufacturing Co.*, 388 U.S. 395 (1967), the Supreme Court narrowed the holding of a previous case that defined when fraud in the inducement may be used to invalidate an arbitration agreement. *Id.* at 403-04. The Court had previously held that a contract requiring arbitration was unenforceable when the arbitration clause was used to defraud the party against whom it was being asserted. *Moseley v. Elec. & Missile Facilities, Inc.*, 374 U.S. 167, 171 (1963). But *Prima Paint* narrowed *Moseley*: the Court concluded that a court may find an arbitration clause unenforceable only if the plaintiff adequately alleges that the fraud involves the arbitration clause itself, rather than the overall contract. *Prima Paint*, 388 U.S. at 403-04. If the allegation of fraud involves the contract as a whole, the determination of whether the contract is unenforceable is appropriately made by the

15

arbitrator. *Id.*

Since the Supreme Court decided *Prima Paint*, the Seventh Circuit has repeatedly embraced the distinction that *Prima Paint* announced. *See, e.g., Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 641 n. 4 (7th Cir. 1993) ("a court may consider a claim that a contracting party was fraudulently induced to include an arbitration provision in the agreement but not claims that the entire contract was the product of fraud."). *See also Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587 (7th Cir. 2001) (same); *Colfax Envelope Corp. v. Local No. 458-3M, Chicago Graphic Commc'ns Int'l Union, AFL-CIO*, 20 F.3d 750 (7th Cir. 1994) (same).

Zoller and Beigelman do not specifically allege that UBS fraudulently induced them to adopt the arbitration clause of the contract. Rather, they have alleged only that UBS fraudulently induced them to adopt the entire contract. *See, e.g.,* Compl. ¶ 9.

Zoller and Beigelman contend that *CBS Employees Federal Credit Union v. Donaldson, Lufkin and Jenrette Securities Corp.*, 912 F.2d 1563 (6th Cir. 1990), establishes a different rule. In *CBS*, the Sixth Circuit held that an arbitration agreement that the defendants used to "coerce" the plaintiffs into approving unauthorized trading advanced a fraudulent scheme and thus could not be enforced. *Id.* at 1568. Thus although *Prima Paint* held that a plaintiff could invalidate an arbitration clause only if the clause itself was induced by fraud, *CBS* permitted plaintiffs to invalidate an arbitration clause that was used to further a fraud. *Id.* Yet the Sixth Circuit limited the scope of *CBS* in a subsequent decision. In *Arnold v. Arnold Corp.-Printed Communications for Business*, 920 F.2d 1269, 1278 (6th Cir. 1990), the Sixth Circuit reaffirmed the *Prima Paint* standard: the plaintiff must present "a well-founded claim of fraud in the

inducement of the arbitration clause itself, *standing apart from the whole agreement*, that would provide grounds for the revocation of the agreement to arbitrate." *Id.* The court also noted that, were it to hold otherwise, the plaintiffs' proffered argument "could be inserted into any complaint involving fraud and arbitration." *Id.* The Seventh Circuit has similarly rejected this sort of argument. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1150-51 (7th Cir. 1997) ("The Hills' remaining arguments, including a contention that the arbitration clause is unenforceable as part of a scheme to defraud, do not require more than a citation to *Prima Paint*.").

Thus the issue is whether the plaintiffs have presented evidence showing they were fraudulently induced to accept the arbitration clause itself, rather than the contract as a whole. They have not. The Court concludes the plaintiffs have not shown that their arbitration agreements are unenforceable as fraudulently induced.

**IV.    Waiver of right to arbitrate**

Next, plaintiffs argue that UBS has waived its right to arbitration by attempting to litigate the merits of their claims. To determine whether a party has waived arbitration, a court asks "whether, based on all the circumstances, the party against whom the waiver is to be enforced has acted inconsistently with the right to arbitrate." *Armstrong v. LaSalle Bank Nat'l Ass'n*, 552 F.3d 613, 616 (7th Cir. 2009) (internal quotation marks and citation omitted). "The central question is whether the party against whom the waiver is to be found *intended its selection* . . . ." *Grumhaus*, 223 F.3d at 650 (emphasis added).

The issue before the Court is whether UBS, through its litigation conduct, effectively has presented the plaintiffs' claims to the Court for determination. The Court

17

concludes that UBS has not done so.  To the extent UBS argued that Zoller could not prevail on her claims because she had released UBS from any liability, the Court has, as noted earlier, construed that as a premature argument against her ability to serve as a representative in a class or collective action, not as an argument on the merits.

UBS's actions at earlier stages of this case, before it was reassigned to the undersigned judge's docket, were not inconsistent with its right to arbitrate, especially when compared to litigants who did waive arbitration by inconsistent conduct.  In *Banc of America Securities LLC v. Independence Tube Corp.*, No. 09 C 7381, 2010 WL 1780321 (N.D. Ill. May 4, 2010), for example, the court found that Independence Tube had waived its right to arbitrate when it filed a lawsuit in court, sought discovery, opposed transfer out of the courts, and opposed a motion to dismiss. *Id.* at *7-8. Independence Tube sought arbitration only when it realized the court might dismiss one of its claims with prejudice.  *Id.* at *8.  In contrast, UBS, which promptly moved to compel arbitration and only argued against Zoller's claim as part of its contentions about the viability of the plaintiffs' putative class or collective action, has not acted as though it wishes to have the Court to decide Zoller's claim, let alone Beigelman's.

The Court concludes that UBS has not waived its right to arbitrate through its litigation conduct.

## Conclusion

For the foregoing reasons, the Court denies UBS's motion to dismiss Beigelman's claims and to compel arbitration of Zoller's claims [dkt. no. 25].  The Court also sees no appropriate basis to stay litigation of Beigelman's claims pending resolution of his arbitration.  The case is set for a status hearing on April 3, 2018 at 9:30

a.m. to set a schedule for further proceedings.  Counsel are directed to confer in advance of the status hearing to attempt to agree on a schedule to propose to the Court.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  March 19, 2018